Filed:  November 1, 2004

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 03-15(L)
(CR-01-150-A)

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

JAY E. LENTZ,

Defendant - Appellee.

O R D E R

The court amends its opinion filed September 14, 2004, as follows:

On page 19, line 9, line 11, and line 16 -- the word "June" is corrected to read "April."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
   *Plaintiff-Appellant,*

v.

JAY E. LENTZ,
   *Defendant-Appellee.*

No. 03-15

UNITED STATES OF AMERICA,
   *Plaintiff-Appellant,*

v.

JAY E. LENTZ,
   *Defendant-Appellee.*

No. 04-7

In re: STEVEN D. MELLIN, Assistant
United States Attorney,
   *Appellant,*

UNITED STATES OF AMERICA,
   *Plaintiff,*

v.

JAY E. LENTZ
   *Defendant-Appellee.*

No. 04-8

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(CR-01-150-A)

Argued: May 5, 2004

Decided: September 14, 2004

Before MICHAEL, TRAXLER, and KING, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by published opinion. Judge Traxler wrote the opinion, in which Judge King joined. Judge Michael wrote an opinion dissenting in part and concurring in part.

---

**COUNSEL**

**ARGUED:** Vincent L. Gambale, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for the United States. William M. Sullivan, Jr., WINSTON & STRAWN, L.L.P., Washington, D.C., for Appellant Mellin. Michael W. Lieberman, Alexandria, Virginia, Frank Salvato, Alexandria, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney, Kevin V. Di Gregory, Acting Chief, Criminal Division, Morris R. Parker, Jr., Assistant United States Attorney, Steven D. Mellin, Assistant United States Attorney, Patricia M. Haynes, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for the United States. Ryan S. Spiegel, WINSTON & STRAWN, L.L.P., Washington, D.C., for Appellant Mellin. Frank W. Dunham, Jr., Federal Public Defender, Meghan S. Skelton, Research and Writing Attorney, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellee.

---

**OPINION**

TRAXLER, Circuit Judge:

The United States appeals from the district court's grant of Jay E. Lentz's motion for judgment of acquittal on the charge of kidnapping

resulting in the death of his ex-wife, Doris Lentz, in violation of the Federal Kidnapping Act, 18 U.S.C.A. § 1201(a)(1) (West 2000). In a separate appeal, the United States challenges the district court's grant of a new trial under Federal Rule of Criminal Procedure 33 based upon the presence of unadmitted items of evidence in the jury room during deliberations, as well as the district court's findings that this extraneous evidence reached the jury as a result of intentional actions on the part of Assistant United States Attorney Steven D. Mellin. In a third appeal, AUSA Mellin challenges the district court's findings regarding his conduct. Lentz has filed a motion to dismiss Mellin's appeal.

For the following reasons, we reverse the district court's judgment of acquittal, vacate the district court's factual findings regarding intentional conduct on the part of AUSA Mellin, and affirm the district court's grant of a new trial. We dismiss the separate appeal of AUSA Mellin as moot, deny the motion to dismiss filed by Lentz as moot, and remand the entire case to a new district court judge for further proceedings.

## I. Background

This case involves the alleged kidnapping of Doris Lentz ("Doris") by her ex-husband, Jay Lentz ("Lentz"), and her resulting death. Because we are evaluating the propriety of the district court's grant of a judgment of acquittal to Lentz, we review the evidence in the light most favorable to the government.

Lentz and Doris were married in 1989 and had one child, Julia, who was born in 1991. Lentz was verbally and physically abusive to Doris during the marriage. Acquaintances of Doris testified that they observed bruises on Doris's body on at least two separate occasions prior to the couple's separation in 1993. In addition, a Prince George's County police officer testified that he responded to a domestic violence call on one occasion at the Lentz home and observed bruises on Doris's arms. Doris, in deposition testimony taken during the divorce proceedings, had also testified that Lentz physically assaulted her on three occasions during the marriage.

There was significant testimony that Doris was afraid of Lentz during the marriage and that this fear did not subside after their separa-

tion. When Doris first decided to leave the marital home, she asked her Episcopal priest to be present when she told Lentz of her decision. She eventually moved into an apartment in Arlington, Virginia, that provided security, parked in a controlled-access garage, instructed the apartment management not to allow Lentz to proceed past the lobby area when he came to pick up Julia, and generally made arrangements to exchange custody of Julia in public places so as to avoid being alone with Lentz. As recently as the spring of 1996, Doris asked a friend from her church to accompany her to the marital home in Fort Washington, Maryland, where Lentz had continued to live, to pick up Julia because she was afraid to go alone. And a co-worker of Lentz testified that Lentz had told him in 1996 that he had "kicked in [Doris's] front door" because she "had made him mad." J.A. 987.

Although the divorce between the parties became final in 1995, a number of child support, child support arrearage, and marital property distribution issues continued to be the subject of highly contested and bitter litigation in the family court. In particular, the marital home had been placed on the market for sale and Lentz and Doris frequently argued about how the proceeds from the sale should be divided. Doris recorded a number of hostile telephone messages and conversations concerning these ongoing issues that were played for the jury's consideration.

In late March 1996, Lentz's employer received a child support order requiring garnishment of Lentz's wages. However, Lentz asked his supervisor to postpone processing of the order within the company to give him some additional time. Two co-workers of Lentz testified that Lentz told them at about this same time that he would kill Doris before he let her have custody of their child.

On Tuesday, April 16, 1996, Doris met Lentz in the lobby of her apartment building in Arlington, Virginia. Lentz was picking up Julia for a visit with Lentz's parents in Indiana. Unbeknownst to Lentz, Doris had asked her friend, Jennifer Rigger, to follow Doris into the lobby and witness Doris's planned attempt to ask Lentz to sign a document pertaining to their ongoing family court litigation. As a result, Rigger witnessed the exchange of Julia and the ensuing conversation concerning Julia's date of return. Rigger testified that Lentz initially expressed frustration because Doris had only packed one suitcase

instead of the two that Lentz had given them. Rigger also testified that Lentz told Doris that Julia would return on Tuesday, April 23, exactly one week later.

The evidence indicated that Doris initially believed Lentz would accompany Julia on the trip, and Julia was below the minimum age necessary to fly unaccompanied. However, airline records revealed that Julia flew unaccompanied to Indiana on April 17, under Lentz's false representation that she met the minimum age requirement. The round-trip ticket that Lentz had reserved on April 15, had a scheduled return date of Friday, April 26. On April 16, Lentz changed the return date to Saturday, April 27.

There was also evidence that Doris initially believed that Lentz would return Julia to her on Wednesday, April 24. At noon on Saturday, April 20, however, Lentz left a message on Doris's answering machine asking to change the meeting from Wednesday to Tuesday evening, April 23, between 7:30 p.m. and 8:00 p.m., and asking that Doris confirm that this was acceptable.

On Tuesday, April 23, at about 4:00 p.m., Lentz left the following message for Doris: "Yea Dee, this is, uh, you know, I'm back now ok. It's Tuesday afternoon about 4:00 p.m." Doris's mother, boyfriend, aunt, and friend testified that Doris told each of them she was to pick up Julia at Lentz's home on the evening of April 23. Doris's brown day planner indicated that Lentz and Julia would be returning on that date.[1] In addition, Rigger testified that she and Doris talked by telephone after Doris got home that evening and that Doris ended the conversation at approximately 6:50 p.m., telling Rigger that she had to leave to go pick up Julia at Lentz's home or Lentz would be angry.

There was no eyewitness testimony that Doris arrived at Lentz's home that evening. Telephone records from April 23 indicate that two calls were placed from Lentz's mother's residence in Indiana to

---

[1]A second black day planner belonging to Doris indicated that Julia would be returning on April 24, which the government argued was also consistent with Lentz's April 20 telephone message changing the pick-up from Wednesday to Tuesday.

Lentz's house in Maryland between 10:00 and 11:00 that evening, but Lentz's mother does not recall speaking to Lentz. A six-minute telephone call was placed from Lentz's home to his mother's home a few minutes after 12 a.m. on April 24.

On April 24, at 8:30 a.m., Doris and Lentz were scheduled to appear at a hearing in the family court case. Although scheduled to see Doris two hours later, Lentz left a message on Doris's answering machine at 6:14 a.m., stating that his mother had rescheduled Julia's flight and that she would be returning on Thursday, April 25, instead of Saturday, April 27. Lentz appeared at the 8:30 a.m. hearing with his attorney, but left after a short time. Doris's attorney also appeared, but Doris did not. Lentz appears to have returned to his home, where another telephone call took place between his home and his mother's home in Indiana. Lentz's coworker, Sherrie Roske, testified that Lentz arrived at work after noon that day, looking disheveled, with bags under his eyes. In the meantime, Lentz's parents had changed Julia's return date from April 27 to April 25 in order to accommodate their need to travel on business elsewhere. At no time, however, was Julia's ticketed return date scheduled for April 23.

On Thursday, April 25, Doris's co-worker contacted the Arlington County Police to inform them that Doris was missing, and it was soon discovered that the last known plan on Doris's part was to travel to Lentz's home on the evening of April 23 to pick up Julia. During his initial interview with the police, Lentz said that he had last spoken to Doris on April 23 between 5 p.m. and 6 p.m., and told her not to come pick up Julia, a conversation that would have preceded the 6:50 p.m. time that Rigger had said Doris ended their conversation to go to Lentz's home. However, just before midnight on April 28, after the news spread that Doris was last heard from around 7:00 p.m. on April 23, Lentz left a voicemail message with a police investigator stating that he had been mistaken earlier and that he had last spoken to Doris around 6:50 p.m. on April 23. In the meantime, Lentz had spoken to Marilyn Sauder, a babysitter for Julia, who testified that Lentz said he told Doris that Julia would not be returning on the evening of April 23 due to a ticketing mix-up and that she should not come to get her that evening, but that Doris had come anyway. There was no evidence that the airlines ever made a ticketing mistake.

On April 28, 1996, Doris's car was found in a parking lot in Washington, D.C., approximately eight miles from Lentz's home and on a route between Lentz's home and that of Doris. The witness who reported the abandoned car stated that she first noticed it in the parking lot on April 24, the morning after Doris was last heard from by anyone, and that the parking lot was a known dumping ground for stolen vehicles. When the police arrived to inspect the vehicle, the doors were unlocked and the keys were on the passenger side floor. Doris's purse, complete with wallet, money, checks, and credit cards, was in plain view in the car. The driver's seat was in the position farthest back from the steering wheel, which would have accommodated a tall driver such as Lentz, who is 6 feet tall, but not Doris, who was a little more than five feet tall. The interior of the vehicle and the trunk area were dirty, and there were blood stains on the passenger side of the vehicle. There were also two umbrellas in the back seat, one for an adult and one for a child, and there was evidence that it was raining heavily on the evening of April 23. The floor mats and Julia's booster seat, however, were missing from the car. Two witnesses who had ridden in Doris's car the day before her disappearance testified that the interior of the car was completely clean and stain-free and that the booster seat was in the back of the vehicle at that time. They also testified that it was a clear night and there were no umbrellas in the car.

Shortly after the car was discovered, blood stains found in the interior were tested at the Virginia Forensic Laboratory and confirmed to match that of Doris. After Lentz was indicted in November 2001, the government sent the blood-stained passenger seat to the Virginia Forensic Laboratory for further DNA analysis, along with a DNA sample from Lentz. According to Robert Scanlon, the forensic scientist who completed the testing, all of the bloodstains contained Doris's DNA, with the exception of one 3/4 inch stain found on the center of the passenger seat of Doris's car. Scanlon testified that this sample contained Lentz's DNA.[2] In addition, Scanlon testified that

---

[2]To refute this evidence, the defense presented the testimony of two experts who examined the seat after this testing was completed and testified that they found no evidence of the blood spot. The defense argued that the sample did not exist and, even if it did, that Scanlon had either contaminated the test or that Lentz's DNA was present as a result of "secondary transfer," *i.e.*, a transfer of DNA by the child.

Lentz could not be eliminated as a possible donor of a sample taken from the recline lever of the passenger seat. Witnesses testified that Doris purchased her vehicle after she and Lentz separated, that he had not had access to her car, and that Doris was too afraid of Lentz to have ever let him in the car with her.

It was also discovered that Lentz had left a message with his real estate agent, Diane Ives, on April 22, asking her to remove the lockbox from his home because he wanted to do some interior painting. Ives testified that when she arrived at the home on April 23, she entered the home and noticed a large blue tarp in the foyer but no painting supplies. She removed the lockbox and left. Lentz also requested that his mail delivery be stopped indefinitely, effective April 24. On Saturday, April 27, Ives replaced the lockbox, but Lentz called her and demanded that she remove it again. When she returned to the home, Ives noticed that the blue tarp was gone, but no interior painting had been done, and that a small square on the floor of the carport had been freshly painted a gray color. On Monday, April 29, Ives returned to the house and noticed that the painted area in the carport had more than doubled in size. By May 10, the entire back third of the driveway had been painted gray. The interior was never painted. In addition, two police officers driving by the residence observed Lentz, within several days of the disappearance, washing the floor of the carport with a garden hose. Doris's mother testified that, during a visit to the home to see Julia in June 1996, she noticed that the carpeting had been replaced or very well-cleaned, the living room sofa was missing, and a matching chair had been moved to where the sofa had been previously placed. Within a few months of Doris's disappearance, Lentz obtained a court order, retroactive to April 23, suspending his child support payments and the garnishment order. Lentz sold the marital home in late 1996 and moved with Julia to Indiana.

Because Doris's body was never found, the Arlington County investigation into her disappearance and presumed murder ultimately stalled. The federal investigation continued. On April 24, 2001, a federal grand jury returned an indictment against Lentz, charging kidnapping resulting in death in violation of the Federal Kidnapping Act, 18 U.S.C.A. § 1201(a). In July 2003, a jury found Lentz guilty of the kidnapping charge and returned a unanimous verdict of life imprisonment. Shortly thereafter, the district court granted Lentz's motion for

judgment of acquittal, *see United States v. Lentz*, 275 F. Supp. 2d 723, 749 (E.D. Va. 2003), and the government filed a notice of appeal.

## II.   Appeal No. 03-15

We first consider the government's claim that the district court erred in granting Lentz's motion for judgment of acquittal on the grounds that the evidence was insufficient to support the conviction of kidnapping resulting in death.

We review de novo the district court's judgment of acquittal based upon the insufficiency of the evidence. *See United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997). When addressing a sufficiency challenge, "[w]e must view the evidence in the light most favorable to the government and inquire whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *Id.*; *see United States v. Higgs*, 353 F.3d 281, 313 (4th Cir. 2003) (holding that a conviction must be sustained if there is "'evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt") (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). The jury, not the reviewing court, assesses the credibility of the witnesses and resolves any conflicts in the evidence presented. *See Wilson*, 118 F.3d at 234; *United States v. Arrington*, 719 F.2d 701, 704 (4th Cir. 1983). "Those functions are reserved for the jury, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." *Wilson*, 118 F.3d at 234 (internal quotation marks omitted).

### A.   The Federal Kidnapping Act

Adopted in 1932, the Federal Kidnapping Act (the "Act") was primarily designed "to assist the states in stamping out [the] growing and sinister menace of kidnapping" where perpetrators transported their victims across state lines in order to frustrate state authorities confined in their investigations by jurisdictional boundaries. *Chatwin v. United States*, 326 U.S. 455, 463 (1946). As amended, the Act now authorizes the punishment of death or life imprisonment of anyone who

unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, . . . when . . . the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary if the person was alive when the transportation began . . ., if the death of any person results.

18 U.S.C.A. § 1201(a)(1).

Accordingly, in order to establish a kidnapping resulting in death under section 1201(a)(1), the government was required to prove (1) the jurisdictional component of interstate transportation; (2) that Doris was "unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away;" (3) that Doris "was held for ransom or reward or otherwise;" and (4) that death resulted. *Higgs*, 353 F.3d at 313; *United States v. Wills*, 234 F.3d 174, 177 (4th Cir. 2000) (*Wills I*).

### B.    Jurisdiction

There is no dispute that the government presented sufficient evidence to establish the jurisdictional component that Doris was "willfully transported in interstate . . . commerce." 18 U.S.C.A. § 1201(a)(1). There is no statutory requirement that a kidnapper "accompany, physically transport, or provide for the physical transportation of the victim" in order to satisfy the "willfully transported" element of section 1201(a)(1). *Wills I*, 234 F.3d at 178. Rather, it is enough to show that the kidnapper "willfully caused unaccompanied travel over state lines." *Id.* at 179.

In *Wills I*, the defendant left a flyer at the victim's residence in Virginia advertising a job opportunity. The victim — who had identified the defendant as the person who had previously burglarized his home — contacted the defendant at the District of Columbia cellular telephone number provided and arrangements were made for the victim to travel to Union Station for a job interview. The victim's abandoned car was found the following day and he was never heard from again. Thus, the evidence supported the conclusion that the defendant had lured the victim into traveling unaccompanied from his home in Vir-

ginia to Washington, D.C., by promising a job interview in order to eliminate the victim as an eyewitness to the burglary charged against him. Because the victim crossed state lines unaccompanied by the defendant, the district court dismissed the kidnapping charge on the ground that it failed to satisfy the Act's jurisdictional component of interstate transportation.

On appeal from the dismissal of the charge, we held that jurisdiction exists for purposes of the Act "when a victim, acting because of false pretenses initiated at the instance of the defendant, transports himself across state lines without accompaniment by the alleged perpetrator or an accomplice." *Id.* at 176. We explained that

> [t]he plain language of the Act does not require that the defendant accompany, physically transport, or provide for the physical transportation of the victim. Rather, the Act only requires that the victim "is willfully transported." If Congress wished to make accompaniment by the defendant over state lines a requirement under the Act, it could easily have written the Act to provide for it.

*Id.* at 178.

Here, the jury reasonably concluded that Lentz, by telling Doris that Julia had returned from Indiana and arranging for Doris to pick her up from his home on April 23, willfully caused Doris to be transported across state lines from her home in Virginia to his home in Maryland, thereby satisfying the jurisdictional component of the Act.

## C.   The Substantive Elements

The substantive requirements of the statute are that the government prove (1) that Lentz unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away Doris; (2) that Lentz held her "for ransom or reward or otherwise;" and (3) that Doris's death resulted from those actions. 18 U.S.C.A. § 1201(a). It is this "involuntariness of seizure and detention which is the very essence of the crime of kidnaping." *Chatwin*, 326 U.S. at 464; *see United States v. Young*, 512 F.2d 321, 323 (4th Cir. 1975) (noting that "the true ele-

ments of the offense are an unlawful seizure and holding") (internal quotation marks omitted).

Here, the government presented sufficient evidence to support the conclusion that Lentz inveigled Doris into traveling from her home to his, thereby satisfying the seizure element of the Act. *Cf. United States v. Hughes*, 716 F.2d 234, 239 (4th Cir. 1983) (holding that "[b]y inducing his victim by misrepresentations to enter his vehicle and to accompany him, and knowing that the victim's belief as to their purpose and destination is different from his actual illicit purpose, the kidnapper has interfered with, and exercised control over, her actions"). Lentz does not contend otherwise, and also concedes that the evidence was sufficient to support the conclusion that Doris is deceased. Rather, Lentz's challenge to his kidnapping conviction is narrowly centered upon the claim that there was insufficient evidence from which the jury could reasonably have concluded that Doris was held or otherwise restrained by Lentz "for ransom or reward or otherwise." 18 U.S.C.A. § 1201(a). It is to that inquiry that we now turn.

1.

The Supreme Court has held that "[t]he act of holding a kidnaped person for a proscribed purpose," as required by the Act, "necessarily implies an unlawful *physical* or *mental restraint* for an *appreciable period against the person's will* and with a willful intent so to confine the victim." *Chatwin*, 326 U.S. at 460 (emphasis added). It implies "an intent to restrain [the victim's] movements contrary to her wishes." *Id.*; *see United States v. Wills*, 346 F.3d 476, 493 (4th Cir. 2003) (*Wills II*) ("To hold means to detain, seize, or confine a person in some manner against that person's will.") However, "[i]t is not necessary that the government prove that the holding occurred prior to the transportation in interstate commerce." *Wills II*, 346 F.3d at 493.

In *Chatwin*, the Court decided that the victim had not been "held" for purposes of the Act because, even though the victim was mentally-challenged and had been persuaded to stay with the defendants in a plural marriage, the victim had remained free to move about at will. The victim was not "deprived of her liberty, compelled to remain where she did not wish to remain, or compelled to go where she did not wish to go." *Chatwin*, 326 U.S. at 460. Nor was there evi-

dence that the defendants "willfully intended through force, fear or deception to confine the girl against her desires." *Id.* On the contrary, "she was perfectly free to leave the [defendants] when and if she so desired." *Id.*

Lentz claims that the evidence in this case was similarly insufficient to prove that Lentz imposed "an unlawful physical or mental restraint for an appreciable period against [Doris's] will." *Id.* Specifically, Lentz argues that, although his inveiglement of Doris and her unaccompanied travel from Virginia to Maryland caused by it satisfies the jurisdictional and seizure components of the statute, it cannot also serve to establish the "holding" element because there was no evidence that Lentz exerted any physical or mental force sufficient to effect a restraint upon her movements during the trip. In other words, Lentz argues that Doris was at all times "perfectly free" to return to her home or otherwise decide not to complete the journey to pick up Julia at his home. Lentz also argues that Doris's murder upon her arrival at his home (assuming the jury found that this to be supported by the evidence), cannot suffice because a "holding" under the kidnapping statute requires a restraint of the victim beyond that required to accomplish the murder and there is no evidence that Doris was subjected to any physical restraint beyond that necessary to simply kill her upon her arrival.

The government argues to the contrary, contending that Doris was "held" for purposes of the Act in two distinct ways: (1) by deception from the time she was inveigled or deceived into traveling from Virginia to Maryland through the time that she came into Lentz's presence; and, (2) thereafter through physical force or fear up to and during her murder. As explained below, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in its favor, we are satisfied that the evidence, though circumstantial, was sufficient to support the jury's determination that, upon Doris's arrival at Lentz's home, Lentz exerted an unlawful physical or mental restraint for an appreciable period against Doris's will.

2.

At the conclusion of the evidence in this case, the district court instructed the jury that the government was required to prove (1) that

Lentz knowingly and willfully inveigled or decoyed Doris, (2) that Doris was held for ransom, reward, or some other benefit that Lentz intended to derive by so holding Doris, (3) that Lentz willfully transported or caused the transportation of Doris in interstate commerce, and (4) that Lentz's actions resulted in Doris's death. The court instructed the jury that "[t]o inveigle or decoy a person means to lure or entice or lead a person astray by false representations or promises or other deceitful means" and that "[t]o hold means to detain, seize or confine a person in some manner against that person's will." J.A. 1922. In addition, the jury was instructed as follows:

> [T]he government must prove beyond a reasonable doubt that the defendant held his victim for some benefit and that the defendant willfully transported the victim in interstate commerce.
>
> It is not necessary that the government prove that the holding occurred prior to the transportation in interstate commerce.
>
> However, the holding must be separate from . . . the transportation.

J.A. 1924. Later, the jury was informed, in response to its question, that "the defendant himself [would] have to do the actual detaining/holding" of the victim. J.A. 2059A.

With regard to the evidence of "holding," the government produced testimony from the child's babysitter that Lentz admitted Doris had come to his house on the evening of April 23. Additionally, the government's evidence showed that Lentz stopped his mailman from coming to the house and that the realtor's lockbox was removed to keep unexpected and unwanted visitors from entering the house; that a blue tarp was present in the foyer of the home on the morning of April 23, but with a false pretense by Lentz as to its purpose; that both Doris's blood and Lentz's blood were found later in her car, which witnesses testified was clean and stain-free the evening before and which witnesses testified Doris would never voluntarily have allowed Lentz to enter; and that the sofa had been removed from the home and replaced with its matching chair, all of which taken together provides

circumstantial evidence that Doris was brought into Lentz's home upon her arrival and murdered there.

The evidence also sufficiently supported the conclusion that, once Doris arrived at Lentz's home, Lentz was in the position of employing further means, be it deceit or force, necessary to bring Doris inside the home where he could physically confine her and kill her. From the moment Doris pulled up at Lentz's home, she was in his company and no longer "perfectly free to leave." *Chatwin*, 326 U.S. at 460. Rather, Lentz was then in a position to confine her physically if necessary. *See Higgs*, 353 F.3d at 313 (rejecting challenge to the "holding" element where the evidence supported the conclusion that the kidnapper "was prepared to confine [his inveigled victims] at gunpoint if necessary"); *cf. United States v. Boone*, 959 F.2d 1550, 1555 n.5 (11th Cir. 1992) (noting that "[i]nveiglement becomes an unlawful form of kidnapping under the statute when the alleged kidnapper interferes with his victim's actions, exercising control over his victim through the willingness to use forcible action should his deception fail"). Beyond this, there was also sufficient evidence to support the jury's conclusion that, once Lentz had lured or forced Doris into his home, he continued to hold her and kill her, wrapped her body in the blue tarp, drove her car into the carport, moved her bleeding body out to the carport and into the front passenger seat of the car, disposed of the body, and abandoned her car in a high-crime neighborhood in Washington, D.C., with keys and wallet in plain view, no doubt hoping that someone would steal the car and be caught in it along with Doris's wallet and credit cards.

It is against this backdrop of evidence that we must determine whether there was a logical and supporting evidentiary basis for the jury to conclude that Doris was "held" by Lentz after she arrived at his house but before the fatal wounds were inflicted. We believe there was. Given the evidence that Doris was extremely fearful of being alone with Lentz out of the public eye and given the evidence that Doris was inside the house when she was killed, the jury could reasonably conclude from circumstantial evidence that after her arrival at the house Lentz either physically forced or lured her inside or otherwise confined her against her will for an appreciable period of time in order to accomplish the purpose of the seizure — her murder and its accompanying benefit to him in the domestic litigation. The

defense argues correctly that there is no direct evidence as to exactly what events occurred in the house preceding Doris's murder. However, the government's inability to produce direct evidence on this issue is not fatal to its case, because we believe the circumstantial evidence in the case supports the jury's finding that Lentz himself accomplished "the actual detaining/holding" of the victim against her will, separate and apart from her trip to the house. J.A. 2059A.

To conclude, the evidence was sufficient for the properly instructed jury to convict Lentz of kidnapping resulting in murder. In applying the instructions given, a reasonable juror could readily have concluded from the evidence that Lentz, after inveigling Doris into traveling across state lines to his home, employed "unlawful physical or mental restraint for an appreciable period against [Doris's] will and with a willful intent so to confine [her]" inside his home. *Chatwin*, 326 U.S. at 460. Once Doris arrived at Lentz's home, Lentz had successfully transported Doris across state lines by his deception and was in the position to complete his plan to confine and kill Doris in private to eliminate any requirement that he split their marital assets, and eliminate any further liability on his part for child support payments. *See United States v. Healy*, 376 U.S. 75, 81 (1964) (holding a victim "for ransom, reward or *otherwise*" under § 1201(a) encompasses holding a victim for any reason which is of benefit to the defendant); *United States v. Childress*, 26 F.3d 498, 503 (4th Cir. 1994) (stating that the kidnapping need not be performed for pecuniary gain to satisfy the "ransom or reward or otherwise" element and that it is sufficient if "the defendant acted for *any* reason which would in *any* way be of benefit").

Nor does this conclusion conflict with the purposes of the Act, as argued by Lentz, by "federalizing" a state murder case. Lentz's plan was to cause Doris, through his deceit, to travel beyond the borders of her home state into his home state and then to involve yet another jurisdiction in the investigation by dumping Doris's blood-stained vehicle and personal effects in the District of Columbia. *Cf. Hughes*, 716 F.2d at 239 ("The policy justification for the original federal kidnapping statute was to provide federal officials the 'power to disregard [state] barriers in pursuing' kidnappers who planned their activities to take the best possible advantage of the limited authority and coordination of state law enforcement agencies.") (quoting *Chat-*

*win*, 326 U.S. at 463). According to representations made by the government, the federal investigation and prosecution proceeded precisely because jurisdictional boundaries stifling the state prosecutions had come into play and the circuit case law interpreting the Act, specifically the *Wills I* case, had opened up the prospect of the federal charge. *See Lentz*, 275 F. Supp. 2d at 748, n. 29 ("They couldn't charge a homicide in Prince George's County," where Lentz resided, and "[t]hey couldn't charge anything in Arlington. All you ha[d] in Arlington [was] someone being told to come over and get the child. That's no charge."). According to the district court, "[u]nlike the classic tragic kidnapping case, . . . this case suggests a mysterious *intrastate* disappearance of Ms. Lentz under suspicious circumstances." *Id.* at 748 (emphasis added). On the contrary, the evidence in this case supports the jury's finding that Doris was held and killed *after* Lentz tricked her into traveling *interstate* for the purpose of avoiding further domestic litigation and liabilities on his part.

For similar reasons, we reject Lentz's suggestion that the evidence in this case cannot suffice to establish a "holding" of Doris under the Act because it demonstrates no more than a holding incident to her murder. *Compare United States v. Howard*, 918 F.2d 1529, 1537 (11th Cir. 1991) (reversing conviction for conspiracy to kidnap and attempted kidnapping of a federal agent under § 1201(a)(5) where defendants, during an attempted drug buy, unsuccessfully tried to force the agent into their vehicle because the record was "devoid of evidence to support an inference that [defendants] would have detained [the agent] after stealing his money, and the limited detention inherent in the crime of robbery does not rise to the level of a kidnapping in this case"), *with United States v. Etsitty*, 130 F.3d 420, 427 (9th Cir. 1997) (per curiam) (affirming kidnapping conviction under § 1201(a)(2) of horse-back rider who "roped" a 16-year-old girl on an Indian reservation and rejecting claim that the kidnapping charge was merged into an assault charge because the charges of kidnaping and assault involved different elements and because "a reasonable trier of fact . . . could find seizure, holding or detention" and defendant "prevented [the victim] from escaping, in effect seizing or holding her, for a substantial period of time, for the purpose of causing her considerable bodily and emotional harm").

In *Chatwin*, the Supreme Court instructed that the holding need only be for "an appreciable period" of time. The "holding" or "deten-

tion" element is separate and distinct from the "kidnapping" or "seizure" element, but they should not be viewed in a vacuum. In this case, there was evidence that Doris was seized by inveiglement, transported across state lines by virtue of that inveiglement, and held by Lentz for the purpose of killing her and eliminating the pending custody, support, and marital asset issues. Far from a routine state murder case, it is this type of seizure, interstate transportation, and holding that the Act, as amended, was intended to reach. *Cf. Wills II*, 346 F.3d at 493 ("'Nothing in the policy [disregard of State borders in pursuit] justifies rewarding the kidnapper simply because he is ingenious enough to conceal his true motive, until he is able to transport . . . [his victim] into another jurisdiction.'") (quoting *Hughes*, 716 F.2d at 239).

For the foregoing reasons, we hold that the district court erred in granting Lentz's motion for acquittal.[3]

### III.    Appeal No. 04-7

We turn now to the government's appeal of the district court's decision granting Lentz a new trial based upon the presence of extraneous items of evidence in the jury room during deliberations and the court's accompanying findings that the extraneous evidence reached the jury as a result of intentional misconduct on the part of AUSA Mellin.

### A.    Background

Shortly after the jury returned the kidnapping conviction, three jurors contacted defense counsel and informed them that a brown leather Day Planner (the "brown day planner") and a black Wisconsin Paralyzed Veterans of America pocket-sized calender (the "black day planner") belonging to Doris had been present in the jury room during deliberations. Among other things, the planners contained Doris's

---

[3]Because there was sufficient evidence supporting the jury's determination that Doris was held upon her arrival at Lentz's home, it is unnecessary for us to address the government's position that Doris was held by deception during her unaccompanied journey from Virginia to Maryland.

notes concerning Lentz's harassing and threatening behavior towards Doris and Julia's day care provider; notes concerning Doris's efforts to obtain a protective order; names and telephone numbers of police officers and a domestic violence support group; and notes summarizing derogatory statements about Doris made by Lentz to Julia. The black day planner was not marked as an exhibit, but Lentz had offered two photocopied pages from it into evidence during the cross-examination of Doris's friend, Jennifer Rigger. These pages indicated that Doris had expected Julia to return from her Indiana trip on April 24, 1996, which contradicted Rigger's testimony that Doris told her that she was picking up Julia at Lentz's home on the evening of April 23, 1996. The brown day planner was pre-marked Exhibit 548 by the government, but the government only submitted two photocopied pages from it into evidence during its re-direct examination of Rigger. These pages corroborated Rigger's testimony that Doris had expected Julia to return from her Indiana trip on April 23, 1996.[4]

On July 25, 2003, Lentz moved to vacate the jury's verdict, asserting that he had been prejudiced by the presence of the day planners in the jury room during deliberations. In addition, Lentz asked the district court to "hold an evidentiary hearing to determine whether the facts surrounding the inadmissible materials making their way to the jury dictate that a retrial should be barred" under *Oregon v. Kennedy*, 456 U.S. 667, 674-75 (1982). J.A. 3322; *see Kennedy*, 456 U.S. at 675-76 (holding that "[p]rosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, . . . does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause").

At the conclusion of a motions hearing on August 14, 2003, the district court deferred ruling on Lentz's motion to set aside the jury verdict based upon the alleged prejudicial effect of the day planners

---

[4]During closing arguments, the government argued that the April 24 entry in the black day planner was consistent with the message that Lentz left on Doris's answering machine requesting that they "move the pick up" of Julia from Wednesday, April 24, to Tuesday evening, April 23, and that, in any event, the black day planner entry was inconsistent with Julia's return flight, which Lentz never scheduled for either date.

and granted Lentz's request for an evidentiary hearing. United States
Attorney Paul McNulty and Federal Public Defender Frank Dunham
were instructed to conduct an inquiry within their respective offices
"to ascertain what the facts are concerning the handling of these docu-
ments," J.A. 3561, and to select counsel to present the testimony of
the trial attorneys and others who handled the exhibits. The district
court indicated that each person who handled the exhibits would be
given an opportunity to testify, along with the district court's own
staff who were involved in the gathering of exhibits for submission
to the jury.[5]

On November 4 and 5, 2003, the district court held the evidentiary
hearing into the question of whether there had been intentional mis-
conduct and heard arguments from counsel on whether the jury's con-
sideration of the unadmitted evidence was sufficiently prejudicial to
warrant the grant of a mistrial or new trial under Rule 33. Three
jurors, the court's security officer, the court's deputy clerk, three
defense attorneys, two prosecutors, two government support staffers,
an FBI Agent and an Arlington County Police Officer testified at the
hearing.

On January 29, 2004, the district court issued a memorandum opin-
ion summarizing the testimony and finding that the two day planners
had been excluded from evidence but were nonetheless "intentionally
submitted to the jury by the Government." J.A. 2834. The district
court placed the blame exclusively upon AUSA Mellin. Among other
charges, the district court found that Mellin placed the two day plan-
ners with the evidence after counsel and the court clerk sorted the evi-
dence for the jury, and that he did so with the "intent to act outside
the Orders of th[e] Court and the confines of the law." J.A. 2869. The
court further concluded that Mellin's "actions with the day planners
suggest that this conduct was not a benign act or negligent error," but
rather a "reckless" and "intentional" act on his part. J.A. 2869.

---

[5]The government thereafter sought a writ of mandamus from this court
seeking recusal of the district judge from conducting the hearing into
how the evidence found its way into the jury room because the hearing
would necessarily require the judge to weigh the credibility of the gov-
ernment representatives against his long-time court personnel. We sum-
marily denied the writ. *See In re United States of America*, No. 03-21
(4th Cir., Oct. 3, 2003).

In the order, the district court also found that the "submission [of the evidence] was not benign because it violated [Lentz's] Sixth Amendment right to confrontation and prevented him from receiving a fair trial," and that the government had "fail[ed] to meet its burden to prove that the submission was harmless because the evidence bolstered the [g]overnment's arguments and completely destroyed [Lentz's] credibility and, therefore, his case." J.A. 2834. Despite the district court's findings of intentional misconduct, however, the district court made no ruling pertaining to Lentz's contention that a retrial should be barred under the double jeopardy clause. Instead, the district court granted a new trial in the event this court reversed the earlier judgment of acquittal. On February 13, 2004, the government filed a notice of appeal from the district court's order. We first address the evidence and findings regarding intentional misconduct on the part of Mellin and then review the district court's determination that the jury's verdict should be set aside based upon the prejudicial effect of the extraneous evidence.

## B.    Intentional Misconduct Findings

The following facts, gleaned from the evidentiary hearing conducted by the district court, appear to be undisputed. On the afternoon of June 16, 2002, the jury received its instructions and the parties completed their closing arguments in the guilt phase of Lentz's trial. The jury was then instructed to return at 10:00 the following morning to begin deliberations. At approximately 9:30 the next morning, the defense team (Michael Lieberman, Frank Salvato, and Judy Clark) and the prosecution team (AUSA Steven Mellin, AUSA Patricia Haynes, and Michael Chellis) met with courtroom deputy clerk Joanna Solomon and court security officer William Scruggs in the courtroom to assemble the admitted trial exhibits and prepare them for transport into the jury room. Also present and assisting in the endeavor at various times were FBI Special Agent Brad Garrett, Arlington County Sergeant John Coale, Information Technologist Tyrone Bowie, and an intern with defense counsel Salvato's office. After Solomon sorted and reviewed the exhibits with counsel for both sides, the items were turned over to Scruggs to be loaded onto an evidence cart and transported into the jury room. According to the jurors, at some point after they began their deliberations, the black and brown day planners were noticed and reviewed in the jury room,

although the earliest any juror recalled seeing the day planners was on the second day of deliberations.

By all accounts, the process of sorting and loading the evidence took place among four counsel tables for a period of at least 45 minutes and involved up to twelve people (not counting any persons milling about behind the bar or unnoticed in the well). The precise events occurring during this time period and, in particular, the method by which the two day planners found their way into the jury room, however, have been the subject of much uncertainty and confusion.

Solomon, the courtroom deputy clerk, testified that she began her task by checking her exhibit list with counsel for both sides and that the sorting of unadmitted evidence from admitted evidence took place primarily at the back counsel table used by the government. According to Solomon's list, four pages from the brown day planner and two pages from the black day planner had been admitted into evidence, and it appears that these excerpts were marked as exhibits, placed with the admitted evidence, and taken to the jury. Solomon testified that when sorting the evidence, she "endeavored to look at everything on the [back] table" and that "everything on the back table [was to] be put on the cart to go to the jury." J.A. 2430. She then turned the evidence over to Scruggs for loading onto the cart. She testified that she did not see either the brown day planner or the black day planner during the process.

According to Scruggs, after the evidence was turned over to him by Solomon, his "understanding was that only items that were sitting on the back table on the right hand side . . . [were] approved to go back to the jury." J.A. 2439. Scruggs testified that he was responsible for loading the cart, but that the cart was actually loaded by "a combination of people" helping him. J.A. 2440. Specifically, he testified that Chellis, Agent Garrett, and Sergeant Coale all offered to assist him. Scruggs testified that he saw the brown day planner on the back table with the evidence for the jury at the time the cart was loaded and that he later saw the black day planner with the evidence when he retrieved it from the jury room. In an earlier affidavit, however, Scruggs stated that he had seen both the black and brown day planners "[s]itting on the rear table with the items of physical evidence." J.A. 3525. According to Scruggs's affidavit:

I was in court on August 14, 2003, when Judge Lee deter-
mined that these same two diaries that I had seen on the rear
table with the other items of physical evidence, had gone to
the jury. The books Judge Lee held up in open court on that
occasion appeared to be the same two books I saw on the
prosecution's rear table.

As I loaded the notebooks on the front table onto the cart,
[Garrett, Coale, and Chellis] offered to assist me by loading
the items from the rear table onto the cart. At that time, the
two diaries were included along with the other items loaded
onto the cart. I cannot say which of the three gentlemen
actually placed the diaries on the cart or where on the cart
they were actually placed . . ., but I do remember that they
were on the cart.

J.A. 3525-26. Scruggs testified at the hearing that "[n]o one got near
the cart once it was loaded." J.A. 2459. In sum, Scruggs testified that
"when Judge Lee held up the [day planners] in open court and said
. . . the issue was how did they get back to the jury," he "knew right
then how they had gotten back to the jury" — they were present on
the back prosecution table and were loaded along with the items of
admitted evidence onto the cart that day. J.A. 2461. Scruggs could not
state who placed the day planners with the evidence or which helper
loaded the day planners onto the evidence cart, but made no mention
of Mellin's presence in the area at the time or any assistance offered
by him.

   Defense counsel Lieberman, Salvato, and Clark testified that they
were also present when the exhibits were assembled for the jury, but
did not observe anyone placing the day planners with the admitted
evidence or on the evidence cart. According to defense counsel, at
one point very early in the process, Mellin sought approval to remove
the contents of the brown day planner from its leather cover and to
submit the cover with the admitted excerpts from it, but no one
checked to see if this was done. According to Clark, after the exhibits
were loaded on the cart, "somebody said, well, who wants to inspect
the cart now" and Lieberman walked over to the cart, looked it over,
and moved some boxes around. J.A. 2471. Lieberman confirmed that
he did so, but he did not individually examine every item and he did

not recall seeing either day planner on the cart. This testimony appears to be inconsistent with Scruggs's testimony that "[n]o one got near the cart once it was loaded." J.A. 2459.

Michael Chellis, an attorney employed by the U.S. Attorney's office, testified that he was charged with the primary responsibility for sorting the government's exhibits after the trial. Chellis testified that he met with Solomon to review the Clerk's exhibit list. He testified that Solomon told counsel for both sides that the few items not listed as admitted could be admitted if both sides agreed. In particular, Chellis recalled that the blood evidence was not listed as admitted, but that the parties agreed that it should be loaded on the cart and taken to the jury anyway. Haynes also testified about a similar conversation between counsel and Solomon. Chellis testified that he had placed the black day planner on Mellin's office chair a few days before closing and that he later saw it on the government's counsel table in the courtroom. Chellis admitted that he personally placed the brown day planner on the back counsel table, which is consistent with Scruggs's testimony, but that he did not intend to place it with the admitted items of evidence.

After Chellis testified, Solomon was recalled by the government. Solomon initially denied having ever told either side that evidence that was intended to be, but inadvertently not, admitted during the trial could be admitted and sent to the jury by agreement. After retrieving her exhibit list, however, Solomon acknowledged that her list did not have the blood evidence as being used or admitted and did not have the car seat evidence as being admitted. These exhibits were loaded onto the cart and taken to the jury, and it appears that the parties agreed that these exhibits should have been shown as having been used and admitted during the trial. According to Solomon, there was another list that she believed she must have inadvertently discarded, "thinking [she] had everything transferred to one" list. J.A. 2716.[6]

---

[6]The record is unclear as to when this error on the court clerk's part took place. Solomon testified on redirect examination that she had both lists when she checked the defense and government exhibits. However, Chellis's testimony, Haynes's testimony, and other portions of Solomon's testimony indicate that the error occurred prior to the sorting of the exhibits and Judge Lee's order seems to interpret the testimony on this issue in the latter fashion.

There was also undisputed evidence that, after the jury deliberations had concluded, Solomon had mistakenly returned a borrowed CD player to the AUSA's office with an original CD exhibit in it.

For his part, AUSA Mellin testified that he last remembered seeing the brown day planner during closing arguments the night before the evidence was submitted to the jury. He testified that he arrived at the courtroom with AUSA Haynes the next morning and had a conversation with defense counsel about the brown day planner early during the process of sorting the evidence. He did not recall, however, asking to insert the photocopied pages in the brown leather binder in lieu of its entire contents or having it in his hand at the time of the conversation. With regard to the black day planner, Mellin also did not exclude the possibility that it was in the courtroom that morning, although he testified that he was not aware of it being there and last remembers specifically seeing it several days before closing arguments.

Based upon the testimony and evidence presented, the district court made a number of findings and conclusions regarding the "responsibility" of the people involved in the trial process for the extraneous evidence reaching the jury. The district court attributed no responsibility to the court clerk or court security officer and no responsibility to any member of the defense team. Rather, the district court attributed sole responsibility for the erroneous submission to Mellin and found that the submission was the result of intentional misconduct on his part. Specifically, the court found that "Mellin [personally] placed the two day planners with the evidence for the jury," and that "[h]e did this after the lawyers and court clerk had prepared all of the admitted evidence for the jury." J.A. 2867. According to the district court's view of the evidence,

> after all of the lawyers and the courtroom clerk completed their review of the evidence, Mr. Mellin placed the unadmitted day planners in the evidence box. The unmarked black day planner, inadmissible evidence, did not emerge from the clear blue sky, and land in the jury room. Mr. Mellin had the black day planner last and was well aware it was inadmissible. Similarly, Mr. Mellin's submission of the whole brown day planner to the jury was an intentional act. Mr. Mellin, after discussing whether he could send the brown day plan-

ner to the jury with defense counsel and acknowledging the
Court's order excluding the whole day planner, inserted the
brown day planner in the evidence box as evidence for the
jury. . . .

The Court concludes that Mr. Mellin's testimony indi-
cates much more than a lack of credibility; rather his testi-
mony demonstrates his intent to act outside the Orders of
this Court and the confines of the law. In sum, the Court
finds that Mr. Mellin's actions with the day planners suggest
that this conduct was not a benign act or negligent error.
Rather this action was reckless, and it was intentional.

J.A. 2868-69.

### 1.  Standard of Review

We review for clear error the district court's factual findings that
AUSA Mellin intentionally placed the day planners with the evidence
for the jury. *See United States v. Jones*, 356 F.3d 529, 533 (4th Cir.
2004). "A finding is 'clearly erroneous' when although there is evi-
dence to support it, the reviewing court on the entire evidence is left
with the definite and firm conviction that a mistake has been commit-
ted.'" *Scrimgeour v. Internal Revenue*, 149 F.3d 318, 324 (4th Cir.
1998) (quoting *United States v. United States Gypsum Co.*, 333 U.S.
364, 395 (1948)). "As an appellate court, we are 'reluctant to overturn
factual findings of the trial court,' and 'this is doubly so where the
question goes to the demeanor and credibility of witnesses at trial,
since the district court is so much better situated to evaluate these
matters.'" *Jones*, 356 F.3d at 537 (quoting *United States v. D'Anjou*,
16 F.3d 604, 614 (4th Cir. 1994)). "Provided that there are two per-
missible ways to view the evidence," such findings "are virtually
unreviewable" on appeal. *Id.* (internal quotation marks omitted).

Although we have the utmost respect for factual findings made by
a district court and, in particular, its credibility determinations, in this
instance we are compelled to vacate the district court's factual finding
that Mellin *intentionally* placed or otherwise ensured that the day
planners in their entirety were taken to the jury room along with the
admitted exhibits. None of the witnesses observed Mellin or anyone

else placing the day planners with the admitted evidence being taken to the jury. Nor did any of the witnesses profess knowledge of any evidence that Mellin or anyone else intentionally slipped the day planners to the jury in order to gain some advantage in the trial. Rather, the district court's factual finding of misconduct is based solely upon its belief that both day planners had been excluded in a pretrial ruling, that the brown day planner had again been excluded at trial, that Mellin's responses concerning the whereabouts of the day planners on the day the evidence was sorted were unconvincing, and that Mellin's demeanor generally indicated that he was not credible on the issue. Having thoroughly reviewed the transcript from the trial and the evidentiary hearing, we are convinced that the district court's finding of intentional misconduct rests upon several clearly erroneous underlying factual findings.

## 2. The District Court's Evidentiary Rulings

At the outset of the findings of fact, the district judge stated that "[t]he trial judge's responsibility is to rule on the admission or exclusion of evidence" and to "rule clearly so that the parties are aware of what evidence conforms to the law." J.A. 2857. However, the district judge erroneously found that, as a result of a pretrial motion in limine filed by the government, he had "issued a seventy-six page definitive opinion where [he had] excluded Doris Lentz's day planners," J.A. 2857-58, that he had denied a subsequent motion to reconsider this ruling, and that he had again ruled the brown day planner inadmissible during trial. It is apparent that this erroneous belief regarding his rulings held special importance for the district judge in assigning responsibility for the day planners reaching the jury room. Throughout the findings pertaining to this issue, the district judge frequently referred to what he believed were government attempts to introduce the evidence which had been refused.[7] And, the district court obvi-

[7]*See* J.A. 2835 (relating that he had "admitted four photocopied pages from the brown day planner and two photocopied pages from the black day planner into evidence . . . to show [Doris's] state of mind regarding her daughter's return from a visit to Indiana," but that "[a]ll other evidence in the two day planners was deemed inadmissible by the Court as irrelevant and unduly prejudicial"); J.A. 2861 (stating that the black day planner was "excluded evidence"); J.A. 2876 (stating that "[p]rior to trial,

ously relied upon this erroneous belief in concluding that Mellin placed the day planners with the evidence with the "intent to act outside the Orders of this Court and the confines of the law." J.A. 2869.

Contrary to the district court's opinion, the seventy-six page pretrial order did not specifically exclude Doris's black day planner or brown day planner from evidence. *See United States v. Lentz*, 282 F. Supp. 2d 399, 411-425 (E.D. Va. 2002).[8] The district court was never presented with a motion to admit either of the day planners into evidence in their entirety. Although the district court's pretrial ruling rejected evidence similar to that contained within the day planners, *see id* at 423-24, the motion itself only sought a pretrial ruling regarding those pages of each day planner that were ultimately ruled admissible.

Compounding this error, the district court also erroneously stated that the government had "attempted to persuade me to revise my rulings on this evidence," and that AUSA "Haynes sought to admit the brown day planner in full despite the clear definitive ruling excluding the full day planner." J.A. 2858. We can find no such definitive ruling, nor any place in the record where Haynes unsuccessfully sought to admit the brown day planner in its entirety.

During her cross-examination of Rigger, Clark had introduced the

the Court excluded the majority of the evidence in the black and brown day planners as hearsay"); J.A. 2879 (stating the he had "declined to admit" the entries); J.A. 2885 (stating that "[t]he black and brown day planners contained several notes and articles that were not admitted because they were irrelevant and prejudicial"); J.A. 2899 (noting that his "pretrial ruling was very detailed" and that "Ms. Lentz's day planner evidence was excluded").

[8]The district judge also stated that this court affirmed his evidentiary ruling in an interlocutory appeal by the government. Our opinion, however, only addressed the narrow issue appealed to us — whether the district court had erred in excluding four specific statements allegedly made by Lentz and two specific statements allegedly made by Doris to other witnesses. *See United States v. Lentz*, No. 02-19, 58 Fed. Appx. 961, 2003 WL 253949 (4th Cir. Feb. 6, 2003).

two pages from the black day planner admitted in the pretrial order that indicated that Julia was scheduled to return on April 24 rather than April 23. On redirect examination, Haynes moved to introduce the two pages from the brown day planner also admitted in the pretrial order that corroborated Rigger's testimony that Doris was to pick up Julia on April 23. The precise colloquy from the redirect examination was as follows:

> Ms. Haynes:  Your Honor, I'd move in Government's Exhibit 548, and there is no objection to it. If I can—
>
> Ms. Clark:  It's just a two-page section because the whole page is a bigger one.
>
> Ms. Haynes:  I think later we might try to want to move the rest in. But for now, we'll just move in these two pages.
>
> The Court:  Okay. Two pages of 548 will be received.

J.A. 599. At the evidentiary hearing, Clark, when asked if she recalled objecting to Haynes's supposed attempt to admit the entirety of the day planner testified as follows:

> [Ms. Clark].  I do now that you've shown me the transcript where I did object. What I did was object to the admission of the entire document rather than just two pages. . . . [A] [r]ather unintelligible one, but I thought I got the message across.

J.A. 2463-64. In our view, if Clark intended to convey that message, she failed to do so. Both the entire brown day planner and the excerpt admitted in the pretrial order were marked by the government as Exhibit 548. Although at first blush it might appear that Haynes was seeking to admit the entirety of Exhibit 548, Clark's interruption of Haynes's motion to introduce the evidence actually indicates that Haynes was only attempting to move in the two-page excerpt from the brown day planner in response to Clark's introduction of the two-page excerpt from the black day planner.

Moreover, we cannot fairly interpret Clark's statement as an objection. At best, it was an interruption that might be viewed as clarification that Exhibit 548 consisted only of the admitted sections and not the brown day planner in its entirety. Finally, we do not interpret the district court's ruling as one *excluding* disputed evidence. The colloquy rather clearly demonstrates that Haynes only moved to introduce the excerpt admitted pretrial and the district court simply admitted that particular evidence.[9]

For the foregoing reasons, we conclude that the district court clearly erred in finding that the government sought to introduce the entire contents of black and brown day planners into evidence pretrial and sought to introduce the entire contents of the brown day planner during trial in contravention of the pretrial order. These clearly erroneous findings regarding the government's attempted use of the day planners are significant because the district court inferred from this perceived pattern on the part of Mellin a steadfast intent and motive on his part to get the day planners admitted into evidence in their entirety despite "the Orders of th[e] Court and the confines of the law." J.A. 2869.

---

[9]Mr. Dunham, who represented the defense team at the evidentiary hearing but was not present during the trial, appeared to acknowledge that the transcript indicated no such ruling, and the district court seemed to have no independent recollection of it. Upon Clark's testimony that she made an objection, the following colloquy took place:

| The Court: | Was [Ms. Clark's objection] sustained or overruled? |
| Mr. Dunham: | The government withdrew the offer of the entire book, but noted that, I think, later, we might try to want to move the rest of it in. But, for now, we'll just move in these two pages. So they withdrew the offer of the entire exhibit. |
| The Court: | All right. Did I admit the two pages at that time? |
| Mr. Dunham: | "Yes, okay, two pages of 548 will be received." That was the Court's ruling. |
| The Court: | All right. Thank you. |

J.A. 2464. Counsel also acknowledged that it was "technically correct" that the day planner was not actually offered in its entirety. J.A. 2823.

### 3.   The Responsibility of the Court Staff

The district court also clearly erred in finding that his courtroom staff had no responsibility for the extraneous evidence reaching the jury. This clearly erroneous factual finding, upon which the district court also bolstered its finding that Mellin must have intentionally slipped the evidence to the jury, is likewise not supported by a fair view of the evidence.

First, it is undisputed that the court clerk made at least two negligent errors in the handling of the exhibits in this case: she discarded the complete exhibit list and kept an incomplete copy, and inadvertently returned an original exhibit to the AUSA's office. The district court acknowledged that the court clerk's "error of discarding the original exhibit list is significant because the unofficial clerk's exhibit list does not accurately reflect the exhibits that were identified and used at trial." J.A. 2860. However, the district court found that Solomon could not be held responsible for the extraneous evidence reaching the jury because (1) the attorneys' exhibit list reflected that the day planners were not admitted into evidence; (2) Solomon's incomplete "exhibit list was accurate with respect to the black and brown day planners because it reflected the fact that only the photocopied pages, and not the original day planners, were admitted into evidence;" and (3) Solomon had never been in possession of the day planners. J.A. 2860.

There is no dispute that counsel knew that only the small excerpts from the day planners had been introduced into evidence and, as far as we know, Solomon was never in possession of the complete day planners, at least prior to sorting the evidence. But these findings do not support the ultimate conclusion that Solomon had no responsibility whatsoever for the evidence getting to the jury room. It is the duty of the court clerk to be responsible for admitted exhibits during trial and jury deliberations and, as acknowledged by the court clerk, to assure that only admitted evidence goes to the jury at the conclusion of the trial. To do this, at the least the clerk must maintain an accurate list of exhibits and handle them with great care. Here, all agree that the court clerk reviewed the trial exhibits at the counsel tables for between 45 minutes and an hour while in the company of, and perhaps being assisted by, up to twelve persons. Having supposedly sep-

arated the admitted items from the non-admitted exhibits at the same counsel table, the court clerk delegated exclusive responsibility to the court security officer to physically load the exhibits onto the cart, with the assistance of whoever happened to help, for transport to the jury. There is no indication that the court clerk at any time separated or reviewed these exhibits by herself or even took primary responsibility for doing so. Nor is there any indication that, after going through the initial process of meeting with counsel to separate and sort exhibits, she physically segregated the exhibits away from the tables in order to check them off from the "official" court exhibit list to fulfill her duty of ensuring that no extraneous material was taken into the jury room.

As a general observation, we think it highly unlikely that anyone would have taken the brazen step of *intentionally* placing unadmitted exhibits either with the evidence on the table or in the loaded cart while in the presence of his or her colleagues, court personnel, opposing counsel, and law enforcement officers. The manner in which the evidence was sorted and loaded for transport to the jury, on the other hand, invited any one of numerous persons to inadvertently place the extraneous items with the "admitted" stack of the sorted evidence. In short, had the court clerk taken the step of physically removing the admitted exhibits from counsels' tables to check them against her official exhibit list, the day planners (however they found their way into the wrong pile) would likely have been discovered and removed without incident.

The district court's findings that "Scruggs did not cause the extraneous evidence to go to the jury" and "cannot be held accountable for the submission of the unadmitted black and brown day planners because his responsibility was limited to the transport of evidence," J.A. 2859, are also clearly erroneous. Scruggs was not merely loading into the cart the evidence that the courtroom clerk instructed him to load. According to his testimony, he was allowing numerous other persons to assist him in his duties and, according to Chellis, the day planners were last known to be at counsel table near the area where this activity was taking place. Thus, Scruggs or one of his helpers may well have inadvertently placed the day planners in the cart while loading it. Scruggs, at least, was convinced that this was exactly how the error had occurred. In addition, the district court never addressed

the testimony of Scruggs and defense counsel over who was handling the evidence after it was placed in the cart. According to Scruggs, no one got near the cart after it was loaded. However, if the testimony of defense counsel is to be credited, Lieberman was invited to handle the evidence after it was loaded.

### 4.    AUSA Mellin

Having erroneously found that the government repeatedly attempted to admit the day planners and that the district court rejected these attempts both during the pretrial and trial proceedings, *and* having erroneously exonerated the court staff from any responsibility for the day planners finding their way into the jury room, the district court proceeded to make a rather broad leap to a finding that Mellin *intentionally* placed both day planners with the evidence after the lawyers and the clerk completed their review of the evidence in order to circumvent the court's prior rulings. These findings are unsupported by the evidence and clearly erroneous as well.

### a.    The Black Day Planner

The district court found that Mellin "is responsible for the intentional submission of the black day planner, excluded evidence, to the jury" based upon his conclusion that "Mellin's demeanor and testimony demonstrate that he was being less than candid with the Court with respect to the black day planner." J.A. 2861. This adverse credibility determination is, in turn, grounded in the following three observations by the trial court: (1) Mellin "was the last person known to have handled the black day planner," but did not "recall its appearance in court on the day the evidence went to the jury;" (2) Mellin testified that he "was unaware of the location of the black day planner during the trial," but filed a response to Lentz's motion for a new trial stating that "both day planners were in the courtroom on the Government's counsel table;" and (3) Mellin "was acutely aware of the importance of the unadmitted black day planner because he directed the jury's attention to it in his closing argument, but he appeared to diminish its importance on the day of the hearing." J.A. 2861-62. These observations, however, are wholly insufficient to support the district court's credibility determination or the ultimate finding of intentional conduct.

First, the fact that Mellin did not recall seeing the black day plan-
ner when the evidence was being sorted, but was known to have had
it a few days before, does not support an adverse credibility determi-
nation. According to the undisputed evidence, Chellis, at Mellin's
request, retrieved the black day planner from the evidence room a few
days before closing arguments to make copies of the pages introduced
by defense counsel. Chellis testified that he placed the black day plan-
ner with the copies in Mellin's chair at their office and that he later
observed the black day planner in the courtroom at the government's
table. However, none of the other witnesses testified that they saw the
black day planner in the courtroom on the day the evidence was
sorted (although Scruggs averred in his affidavit that he did). For his
part, Mellin confirmed that he asked Chellis to obtain copies of the
two admitted pages from the day planner in preparation for his clos-
ing argument. He did not deny that the black day planner was in the
courtroom or deny the possibility that he might have brought it there.
In short, Mellin's testimony that he did not recall seeing the black day
planner in the courtroom is not contradicted and is hardly incriminat-
ing. The only evidence presented was that the black day planner was
last seen on the government's table, but not in Mellin's personal pos-
session.

Second, the government's response to Lentz's motion, indicating
that the black day planner was in the courtroom on government's
counsel table, is not inconsistent with Mellin's testimony that he did
not personally recall seeing the black day planner in the courtroom.
Mellin testified that he did not *personally* observe the black day plan-
ner it in the courtroom, but Chellis testified that he *did* see it on coun-
sel's table at some point after he made copies, which would render the
government's response entirely consistent with the AUSA Office's
internal investigation into the matter. In addition, the court security
officer, at least early on, was attesting that it was in the courtroom as
well.

Finally, the district court clearly erred in finding that Mellin's use
of the black day planner during closing was inconsistent with his
position at the evidentiary hearing that he placed no particular impor-
tance upon it. During closing, Mellin argued that the black day plan-
ner, which indicated an April 24 pick-up date for Julia, was consistent
with Lentz's April 20th telephone message moving the pick-up from

the 24th to the 23rd and that, in any event, the difference was irrelevant because neither date coincided with Julia's return ticket. If anything, Mellin's argument demonstrates that he did *not* view the black day planner entries as important, but rather as a red herring raised by the defense that warranted only a brief explanation in closing.

### b. The Brown Day Planner

The district court's finding that Mellin was also responsible for the intentional submission of the brown day planner is also clearly erroneous. The district court based this finding upon (1) statements by several witnesses that Mellin had physical possession of the brown day planner during closing argument the day before the evidence was sorted; and (2) the testimony of defense counsel that, on the following morning, Mellin asked for permission to remove the contents and submit the brown leather cover with only the admitted pages and that he had the brown day planner and the admitted copies in hand at the time. This testimony is insufficient to support the district court's determination that Mellin intentionally slipped the brown day planner with its entire contents into the evidence being taken to the jury.

First, it was patently insufficient to rest a finding of intentional misconduct on the undisputed fact that Mellin handled the brown day planner during his closing argument and, while doing so, referred to its *admitted* entries pertaining to Julia's expected date of return. According to the district court, Mellin's "act of holding the brown day planner before the jury [during closing] served to focus their attention on it because he wanted to make sure they reviewed it. Accordingly, it is reasonable to infer that Mr. Mellin was himself focused on the importance of the brown day planner." J.A. 2864.

Although the district court does not elaborate upon these inferences, we can only assume that the court believed Mellin concocted a plan before closing to sneak the *unadmitted* and undiscussed portions of the planner into the jury room — evidence he never directly attempted to introduce — with the *admitted* portions that he discussed in his closing and that, as part of this plan, he drew some special attention to the brown day planner to ensure that the jury looked at it. Again, the district court's view of the evidence was no doubt tainted by its erroneous belief that the day planner had been excluded

in the pretrial order and again during trial. Moreover, it is not reasonable to infer from Mellin's mere use of the planner in closing argument that Mellin viewed the unadmitted contents of the brown day planner as so critical or important that he would concoct a plan to highlight the brown day planner to the jury in closing arguments and then slip it to the jury in contravention of court orders. During his closing argument, Mellin referred briefly to the admitted pages from the day planner which corroborated the testimony of *numerous* witnesses that Doris told them she was bound for Lentz's house on April 23 to pick up Julia. The only other demonstrated importance that the pages held for Mellin was that they *contradicted* the black day planner pages which, according to Lieberman, had been submitted to demonstrate "an inconsistency and some confusion with the government's theory" that "on April 23rd of 1996, Doris Lentz went to Jay Lentz's house to pick up their daughter." J.A. 2488.

We are also unable to endorse the district court's finding of intentional conduct based upon defense counsel's assertion that Mellin requested their permission to insert the admitted excerpt from the brown day planner inside the leather cover. Clark and Lieberman testified that Mellin approached Clark and sought approval to remove the contents of the brown day planner from the brown leather cover and submit the cover with the two admitted pages. According to Lieberman, however, the request was made before Solomon even checked the exhibits. Lieberman testified that, "somewhat because of the contentious nature of the relationship Mr. Mellin and I have had over the year," he "said, almost sarcastically to Mr. Mellin, you know, that's fine, Steve, as long as you take everything else out." J.A. 2492.

Mellin acknowledged having a brief conversation with defense counsel about the brown day planner, but did not recall making this alleged request. Mellin's inability to recall caused the district court "great concern." J.A. 2865. However, a fair reading of the evidence does not support the inference that Mellin was not credible, or that this conversation was part of his plan to intentionally slip the entire contents of the day planner to the jury. As lead prosecutor, Mellin was overseeing the process of sorting the exhibits, but no one has asserted that he was involved in the hands-on sorting of evidence. There was no particular controversy going on that would have caused Mellin to remember the specifics of that morning. The prosecution team wit-

nesses had no recollection of a conversation between Clark and Mellin about the brown day planner contents. Solomon and Scruggs were in the area at the time of the purported conversation, but they also testified that they overheard no such conversation. Defense counsel acknowledged that they did not inform Solomon of any agreement to submit the admitted two pages within the brown leather cover and they admitted that no one from the defense team ever saw or examined the brown day planner to see if the contents had been removed and replaced. Indeed, it is quite a stretch to interpret even the defense counsel's recitation of what occurred as an "agreement" to submit the evidence in a different form. According to Lieberman, Mellin asked for permission to submit Government's Exhibit 548 (which consisted of the four photocopied pages) inside the brown leather binder (which was also marked Exhibit 548 but never admitted in its entirety) *before* the exhibits were even checked by the court clerk and received a sarcastic response. And, Solomon testified that Exhibit 548 was sent to the jury in its admitted form. Thus, it seems more probable that Mellin, assuming he ever made the request, simply abandoned it in light of Lieberman's sarcastic response.[10]

---

[10]To the extent that the district court relied upon findings that Mellin's testimony conflicted with that of his team members, we find that determination also to be unsupported by the evidence and insufficient to support a finding of "intentional conduct" on Mellin's part. For example, the district court erroneously found that Mellin testified "that he was not in the courtroom when the evidence was prepared for the jury." J.A. 2865. Mellin testified that he walked to the courtroom with Haynes, left shortly thereafter to make sure that the audio clip CDs had been completed by information specialist Bowie, and returned to the courtroom approximately 20 to 30 minutes later. Accordingly, by Mellin's account, he was present in the courtroom early in the process and again at the conclusion of the process. Similarly, the district court found Bowie's testimony that he prepared the audio clips the night before to be inconsistent with Mellin's testimony that he left the courtroom to work with Bowie on the clips. Although the testimony of neither man is particularly clear, a conclusion that it was inconsistent, thereby indicating untruthfulness on the part of Mellin, is simply not a fair reading of the testimony.

### 5. Conclusion

Having thoroughly reviewed the transcript from the trial and the evidentiary hearing, we hold that the district court's finding that Mellin engaged in intentional misconduct is built upon several clearly erroneous underlying factual findings and an impermissible view of the evidence of record.

It is clear that the evidentiary hearing did little to solve the mystery of how the day planners found their way into the jury room. According to Mr. Chellis, both day planners were in the courtroom prior to the sorting of the evidence and that he placed the brown day planner on the back table where the admitted evidence was being segregated. Scruggs admitted that he saw the brown day planner on the rear table and, in an earlier affidavit, stated that he had seen both day planners on the government's table. The court clerk denies ever seeing either day planner anywhere. By all accounts, three attorneys and one staff person with the defense team, three attorneys and one staff person with the prosecution team, two law enforcement officers, and two court officers were all present at various times during the sorting process. The evidence was sorted on and around four tables in the courtroom and involved "hundreds" of pieces of documentary and physical evidence. Not a single witness observed Mellin place the brown or black day planner with the evidence to be placed on the cart. There is no direct evidence whatsoever, and plainly insufficient circumstantial evidence, that Mellin placed any item on the cart or even that Mellin handled either day planner after the exhibits had been checked or while the cart was being loaded. There is no evidence that Mellin was ever alone in the area of the exhibits. And, there is no evidence that Mellin told anyone to include the day planners with the admitted evidence or to place them in the cart.[11]

---

[11]The district court, near the end of the hearing and after Mellin had testified, also remained clearly in doubt:

> In fact, what's missing for me is still no one seems to want to explain what happened to the [brown day] planner or the black day planner, how they ended up in the courtroom. How they got to the jury room and I'm — I'm waiting for your arguments to hear what happened to it. How did these two items that were never, ever admitted end[ ] up in the jury room?

J.A. 2751. Unfortunately, the district court appeared to believe that fault, indeed intentional fault, had to be placed somewhere, despite the universal lack of knowledge on everyone's part.

In our view, despite the best intentions on the part of the district court and the frustrations associated with this serious incident, the evidence simply cannot support the district court's findings that Mellin intentionally slipped these items into the jury room in contravention of court orders and at risk to his legal career.[12] The district court clearly erred in finding that it had excluded both day planners from evidence pretrial and that it had excluded the brown day planner during a renewed attempt on the part of the government during trial, and erred in finding that these attempts demonstrated a motive on the part of Mellin to get the day planners before the jury notwithstanding the court's rulings.

The district court also clearly erred in finding that his court staff had no responsibility whatsoever for the extraneous evidence reaching the jury room (although we acknowledge that their failures were likely the result of negligence, inattention, or poor procedures on their part). And, the district court clearly erred in concluding that Mellin intentionally placed the brown and black day planner with the evidence to go to the jury based upon testimony that he handled both of the day planners in the days leading up to the sorting of the evidence and handled the brown day planner prior to the exhibits being checked by the court clerk, and the district court's perception that the contents of those planners were especially significant to him.

Accordingly, we reverse the district court's finding of intentional misconduct on the part of the government and, in particular, Mellin.

---

[12]Indeed, with regard to any evidence of intentional misconduct, it makes no more sense to assert that Mellin intentionally placed the items with the evidence in order to bolster his case than it does to assert that the defense team intentionally placed the items with the evidence in order to create a basis for a new trial motion. Neither theory is supported by the record and we frankly think it strains reason to find on this record that an AUSA or anyone else would have even attempted to do so in the midst of all of the people present and involved in the process at the time. In short, there is plenty of blame to go around. The evidence would support a finding that the exhibits reached the jury room as a result of negligent or inadvertent actions on the part of the court staff, on the part of the government and its team, or on the part of someone associated with the defense team. It most likely reached the jury room as a result of the inadvertent errors of some combination thereof.

As an appellate court, we are reluctant to overturn factual findings of a district court. Such findings, particularly those as to credibility, are entitled to great deference, but they are not unreviewable. When findings are based on an erroneous recitation of the record and impermissible inferences drawn from it, we are compelled to vacate them. Here, the evidence was insufficient to support the district court's finding of intentional misconduct or even exclusive responsibility on the part of Mellin for the submission of the extraneous evidence, and the district court clearly erred in so ruling.

### C.   New Trial Grant

Finally, we consider the district court's decision to order a new trial on the kidnapping charge because the unadmitted evidence deprived Lentz of a fair trial.

Under Rule 33, the district court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "If prejudicial evidence that was not introduced at trial comes before the jury, the defendant is entitled to a new trial." *United States v. Barnes*, 747 F.2d 246, 250 (4th Cir. 1984). In determining whether evidence is prejudicial, "[t]he general standard . . . is whether there is a reasonable possibility that the jury's verdict was influenced by the material that improperly came before it." *Id.* (internal quotation marks omitted). "Furthermore, there is a presumption of prejudice where such improper evidence has been made available to the jury, and the burden is on the government to prove that it is harmless." *Id.* at 250-51. It is not necessary that the defendant prove that the prejudicial evidence was intentionally placed before the jury to obtain a new trial; accidental or inadvertent submission of the materials will suffice. *See United States v. Greene*, 834 F.2d 86, 88 (4th Cir. 1987). We review the district court's decision to grant a new trial for abuse of discretion. *See United States v. Cheek*, 94 F.3d 136, 140 (4th Cir. 1996).

Because there is no dispute that the brown day planner and the black day planner were present in the jury room and reviewed by the jurors during their deliberations, we proceed directly to the question of whether the district court abused its discretion in ruling that the

government failed to overcome the presumption that the extraneous evidence was prejudicial.

In his motion to set aside the jury's verdict, Lentz asserted that he was prejudiced by the following notations contained within the brown day planner:

> "School rec'd threatening phone calls. Only way Julia stay Jay sign stat. That he understands cannot pu Julia @ school"

> "4th floor of courthouse - Protective Order -Ex Parte Order - he's served first"

> "Judges in Arlington want criminal charge - protective order"

> "#95-0602025 6/21/95; Chris Bibro; trespassing incident/harassing phone calls -"Karen Crane, Commonwealth Atty's Office 358-7273 protective order/advice" - "Officer Williams #951-204033"

"Det. Capitello - Arl. Co. PD 358-4240; 6/12 spoke with 1:55 p.m."

> "358-4868 - Eileen Segal - Free counseling for domestic violence support group"

J.A. 3320. Lentz also asserted that he was prejudiced by the following notations contained within the black day planner:

> Jan 3, 1996 - Jay pu Julia - she said she wanted to stay with mommy - he told her to stop playing games and get her coat on. . . .

> January 6, 1996 - "My daddy told me you called the police on him. Is that true?"

> January 7, 1996 - "My daddy told me when I was a baby I almost died because you couldn't feed me because you were taking drugs."

January 10, 1996 - "Do you want my dad's house? My dad
told me you want money from him. Is that true?"

January 11, 1996 - "My dad says he loves me more than
you. He says he loves me so much he wishes he could have
me - live with me."

February 11, 1996 - 5:05 p.m. rec'd abusive phone call -
where the hell was I - why not pick Julia up between 4-4:30
- said he hadn't asked for early pu therefore pu at 6:00. . . .

February 23, 1996 - My daddy told me the judge was going
to make him pick me up from school."

J.A. 3321.

The district court grouped the extraneous evidence into four cate-
gories: (1) Doris's notes concerning harassing and threatening tele-
phone calls made by Lentz to her and to Julia's day care center; (2)
Doris's notes indicating that she was pursuing a protective order; (3)
Doris's notes documenting statements made by Lentz to Julia; and (4)
Doris's notations of telephone numbers for an Arlington County
detective and for a domestic violence support group. After determin-
ing that the statements contained within the day planners violated
Lentz's Sixth Amendment right to confront witnesses against him and
were not admissible under any exception to the hearsay rules, the dis-
trict court concluded that they were indeed prejudicial and warranted
the grant of a new trial. Like the district court, we examine each cate-
gory of notations for their prejudicial effect.

With regard to Doris's notes concerning Lentz's harassing and
threatening telephone calls made to her and to Julia's day care center,
the district court held that the evidence was prejudicial because it sug-
gested that Lentz was verbally abusive to Doris and the school staff
in the months just prior to Doris's disappearance. We cannot say that
this was an abuse of discretion, at least insofar as the notation con-
cerning Lentz's threatening telephone call to the day care center.
Although the jury heard testimony and recordings demonstrating that
Lentz's verbal harassment of Doris continued after the separation, the

jury heard no evidence regarding Lentz's alleged harassment of day-care center staff. The fact that Lentz's anger overflowed from Doris to others connected with her reflects on Lentz's dangerousness.

With regard to Doris's notes indicating that she was pursuing a protective order against Lentz, the district court held that this evidence was prejudicial because there was no evidence at trial that Doris had sought or obtained a protective order against Lentz, and certainly not in the months just prior to her disappearance. In addition, the district court rejected the government's argument that these notations were merely cumulative of the evidence regarding Doris's fear of Lentz. Again, we cannot say that this was an abuse of discretion. A number of witnesses testified that Doris was fearful of Lentz and that she had taken measures to avoid isolated contact with him. However, evidence that Doris had taken the additional step of pursuing a protective order and the progress she had apparently made with the authorities is of a quite different character — it may well have indicated to the jury that Doris had a recent and renewed fear of physical assault at the hands of Lentz in the months just prior to her disappearance and that she feared such physical assault enough to take legal measures to protect herself. Although such evidence may well be relevant and admissible in proper form, the district court did not abuse its discretion in concluding that the government failed to establish that the evidence was not prejudicial in the form presented.

With regard to Doris's notes documenting Lentz's alleged statements to Julia about Doris, the district court ruled that the notes were prejudicial "bad character" evidence inadmissible under Rule 404 of the Rules of Evidence, and "cast Mr. Lentz in the worst possible light as a husband and a father." J.A. 2887. As noted by the district court, the statements made by Lentz pertained to matters about which the jury was already aware, such as the acute hostility between the parties, the sale of their marital home and the division of its proceeds, and Doris's attempts to always exchange Julia at the daycare center. Evidence that Lentz told his daughter about these matters, however, is of a more prejudicial nature because the jury could reasonably have inferred that Lentz was disparaging Doris to her daughter in the months prior to Doris's disappearance in an attempt to alienate her from her mother and perhaps ameliorate the absence of her mother in the future.

Finally, with regard to Doris's notations of telephone numbers for an Arlington County detective and for a domestic violence support group, the district court held that the evidence was prejudicial because there was no evidence before the jury that Doris had been the victim of domestic abuse since her separation from Lentz in 1993. We cannot say that this was an abuse of discretion because, as the district court noted, these references suggest that Lentz's physically abusive behavior towards Doris had continued after their separation.

To conclude, the district court held that the government failed to demonstrate that there was no reasonable possibility that the jury's verdict was not influenced by the notations contained within the black and brown day planners. In particular, the district court noted the circumstantial nature of the evidence against Lentz, the extended length of the jury's deliberations in the case, the fact that the jury at one point was deadlocked, and the fact that, during the penalty phase, seven jurors indicated that they had residual doubt. When we look at the information contained in the day planners in light of the district court's evidentiary rulings restricting the government's evidence regarding the actions of Doris and Lentz prior to her disappearance, we can find no abuse of discretion in the decision of the district judge to grant a new trial. This is particularly so when one factors in that Lentz was precluded from rebutting in any way the evidence of actions taken by him and statements attributed to him.[13] Because we cannot say that this was an abuse of discretion, we affirm the district court's grant of a new trial.

### IV.   Remand

Our decision to affirm the district court's granting of a new trial of course necessitates a remand. We have recognized that, even in the absence of established bias, reassignment to a different judge on remand "is appropriate in unusual circumstances where both for the judge's sake and the appearance of justice an assignment to a different judge is salutary and in the public interest, especially as it minimizes even a suspicion of partiality." *United States v. North Carolina*, 180 F.3d 574, 582-83 (4th Cir. 1999) (internal quotation marks omit-

---

[13]We express no opinion, however, regarding the admissibility of these categories of evidence on retrial.

ted); *see also United States v. Gugliemi*, 929 F.2d 1001, 1007 (4th Cir. 1991). Specifically, we consider:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected,

> (2) whether reassignment is advisable to preserve the appearance of justice, and

> (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id.* at 583 (internal quotation marks omitted); *cf. Nell v. United States*, 450 F.2d 1090, 1093 (4th Cir. 1971) (outrageous conduct of attorney may warrant assignment to different judge). Because this is an unusual case, we direct that on remand, the case be assigned to a different judge for a new trial.

Prior to the evidentiary hearing, the government filed a motion asking the district judge to recuse himself from holding the hearing into how the extraneous evidence found its way into the jury room because it would necessarily require the judge to weigh the credibility of the government representatives against his long-time court personnel. The government also took the extraordinary step of seeking a writ of mandamus from this court to recuse the district judge, which we summarily denied.

Since then, however, the district court has extensively criticized the government team and has decided that there was intentional misconduct on Mellin's part during trial and when the evidence was submitted. We have held that such findings are not supported by the record before us and must be vacated, but "imply [no] personal criticism" of the district judge in doing so. *Guglielmi*, 929 F.2d at 1008 (internal quotation marks omitted). We remain concerned, however, that the district judge "cannot reasonably be expected to erase the earlier

impressions from his . . . mind or may tend to lean over backwards or overreact in an effort to be fair and impartial" on retrial. *Id.* (internal quotation marks omitted). In addition, we recognize that Mellin, if he is part of the prosecution team on remand, would be understandably distracted from his task of representing the United States in this very serious case. Although the district judge is very familiar with the case and has already ruled upon various issues, the grant of a new trial wipes the slate clean. We do not believe that any waste or duplication would be out of proportion to the appearance of fairness a reassignment will preserve.

## V.   Appeal No. 04-8

Mellin has filed a separate appeal challenging the district court's findings that he intentionally submitted the evidence to the jury. Lentz filed a motion to dismiss Mellin's appeal because (1) Mellin filed his appeal out of time and (2) Mellin lacks standing to appeal the order because a prosecutor may not independently appeal an order appealed by the government unless it also imposes sanctions upon the prosecutor individually. Because we have concluded that the findings challenged in Mellin's separate appeal were clearly erroneous and they have been vacated in Appeal No. 04-7, we dismiss Mellin's appeal as moot.

## VI.   Conclusion

For the foregoing reasons, we reverse the district court's judgment of acquittal, vacate the district court's findings of intentional misconduct on the part of the government, and affirm the district court's grant of a new trial based upon the prejudicial effect of the extraneous evidence. We also direct that this case be assigned to a different judge on remand.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

MICHAEL, Circuit Judge, dissenting in part and concurring in part:

I respectfully dissent from the majority's decision to reverse the judgment of acquittal entered by the district court. For a kidnapping

to occur, the perpetrator must hold his victim for an appreciable period of time. Here, the jury could only guess that Jay Lentz (Lentz) held Doris Lentz (Doris) prior to her death: there is no direct evidence of a holding, nor is there any evidence from which a holding can be reasonably inferred. In short, the government did not prove a kidnapping. Because reversal of the judgment of acquittal means that the case against Lentz remains open, I concur in parts III, IV, and V of the majority's opinion, which, among other things, vacate the district court's misconduct findings against the government, affirm the grant of a new trial, and deal with procedures on remand. My reasons for dissenting from part II.C of the majority opinion follow.

## I.

Lentz was indicted for kidnapping that resulted in the victim's death, in violation of the Federal Kidnapping Act, 18 U.S.C. § 1201(a). To convict Lentz, the government had to prove: (1) that he willfully caused Doris to be transported in interstate commerce; (2) that he unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried her away; (3) that he held Doris for ransom or reward or otherwise; and (4) that her death resulted. *Ante* at 9-10. The government's theory at trial was that Lentz devised an intricate scheme to lure Doris into driving from Virginia to his house in Maryland, and at some point after she arrived, he killed her. *Ante* at 3-9. The government, however, did not attempt to prove when, where, or how Lentz killed Doris, nor did it offer any evidence or theory about what Lentz did between the time Doris arrived at his house and the time of her death. The government simply failed to prove the holding element of kidnapping.

At the close of the government's case, Lentz made a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, asserting that the evidence was insufficient to sustain a conviction because the government did not prove the holding element. According to Lentz, the jury could do nothing "other than speculate that Ms. Lentz was ever held." J.A. 1603. When the district court turned to the government for a response, the following exchange occurred:

THE COURT:   Tell me what the detention is in this case.

[AN AUSA]:   The detention began, Your Honor, when [Doris] was inveigled. She was being held when she started to be inveigled over to [Lentz's] house. And when she got to his house, he had to hold her to kill her.

Somehow or other, he detained her there and he killed her.

THE COURT:   What evidence do you have of any of that?

[AN AUSA]:   That [Doris] was ultimately killed. And that [Lentz] had to hold her to detain her to ultimately kill her.
. . .

J.A. 1614-15. The district court requested briefing on the holding issue and permitted the trial to proceed. Then, at the close of all the evidence, Lentz renewed his Rule 29 motion, asserting that the government had still not introduced any evidence that Doris was held prior to her death. The district court again took the motion under advisement, this time stating that it would allow the case to proceed to verdict in order to "preserv[e] the government's right to appeal in the event a guilty verdict is returned but then is set aside by the granting of a judgment of acquittal." J.A. 2351.

The government's closing argument to the jury is telling for its failure to point to any evidence that satisfies the holding element of kidnapping. The lead AUSA said to the jury, "Ladies and gentlemen, we don't know exactly what happened to Doris Lentz when she got to the defendant's house on April the 23rd. But we know that she ended up dead." J.A. 1940. The AUSA also reminded the jury that "[t]his is not a murder case. And we're not required to prove the cause and manner of death, how it happened, where it happened. We don't have to prove that. [We] can't do it in this case . . . ." J.A. 1949. The AUSA then attempted to summarize the evidence tending to prove each of the four elements necessary to convict Lentz of federal kidnapping. The transcript of the closing argument shows that the government spent twenty-three pages (J.A. 1950-74) summarizing the evidence that showed Lentz had inveigled Doris into traveling to his house, twelve pages (J.A. 1976-87) summarizing the evidence that showed Doris died as a result of that trip, and two pages (J.A. 1974-76) summariz-

ing the evidence that showed Doris had to travel across a state boundary to reach Lentz's house. In contrast, the government's discussion of the holding element was limited to three lines. Specifically, the AUSA said, "Next element, held for his purpose. This one is very straight[forward]. All you have to do is find that he held her long enough to kill her." J.A. 1976. This argument on holding highlights the fundamental failing in the government's case. It is wrong as a matter of law because the holding in a kidnapping must be for an appreciable period. What is more important, the AUSA did not direct the jury to any evidence that would support a finding that Doris was held. The jury nevertheless returned a guilty verdict. Shortly thereafter, the district court granted Lentz's Rule 29 motion because "the holding element of kidnaping was not proved." J.A. 2387. The government appeals that decision.

## II.

In reviewing a judgment of acquittal, we "view the evidence in the light most favorable to the prosecution and inquire whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Lentz does not contest that the government proved three of the four elements of kidnapping, specifically (1) that he inveigled Doris (2) into traveling across state lines and (3) that her death resulted. Proof of the element that must precede the death — a holding — is contested. Therefore, the narrow question raised by the government's appeal is whether the evidence would allow any rational trier of fact to conclude beyond a reasonable doubt that Lentz held Doris prior to her death. In answering this question, we must keep in mind that:

> The very existence of the *Jackson* test presupposes that juries accurately charged on the elements of a crime and on the strict burden of persuasion to which they must hold the prosecution, nevertheless may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt. The test was adopted to provide an additional safeguard against that possibility, and was to give added assurance that guilt should never be found except on a rationally supportable *state of near certitude*.

*Evans-Smith v. Taylor*, 19 F.3d 899, 905-06 (4th Cir. 1994) (internal quotation marks and citations omitted).

To satisfy the holding element of the Federal Kidnapping Act, the government was required to prove that Lentz imposed "an unlawful physical or mental restraint for an appreciable period against [Doris's] will and with a willful intent so to confine [her]." *Chatwin v. United States*, 326 U.S. 455, 460 (1946). Throughout this case the government has argued that the evidence satisfies the holding element for either of two reasons. First, the government argues that Doris was held "by deception from the time she was inveigled or deceived into traveling from Virginia to Maryland through the time that she came into Lentz's presence." *Ante* at 13; *see also* Appellant's Br. at 52. Second, the government argues that "murder is the ultimate holding," Appellant's Br. at 58, and therefore "the evidence that [Lentz] murdered [Doris], by whatever means, is sufficient to establish a holding by physical restraint." *Id.* at 62. In other words, the government argues that the holding element has been implicitly satisfied because, as Lentz concedes, the evidence was sufficient to show (1) that Doris drove to Lentz's house and (2) that Doris died as a result of her visit there. Again, according to the government, either of these events constitutes a holding.

The majority does not rely on either of the government's theories of holding. Instead, it concludes that "the circumstantial evidence in the case supports the jury's finding that Lentz himself . . . [held Doris] against her will separate and apart from her trip to the house." *Ante* at 16. Specifically, the majority says that a jury could reasonably conclude that once Doris arrived at Lentz's house, he brought her inside and held her there for an appreciable amount of time before her death. *Ante* at 14-16. In support of this conclusion, the majority cites six pieces of evidence: (1) Lentz told his daughter's babysitter, Marilyn Sauder, that Doris had come to his house on the evening of April 23, 1996; (2) Lentz stopped his mail delivery beginning the morning of April 24, 1996; (3) Lentz left a voice message with his real estate agent on April 22, 1996, asking that the lock box at his house be removed so that he could do some interior painting without being disturbed by visitors; (4) Lentz's realtor saw a blue tarp in his foyer on the morning of April 23, 1996; the tarp was gone when the realtor returned on April 28, 1996, but no painting had been done; (5) Doris's

car contained blood stains from Lentz and Doris that were not present as of April 22, 1996; (6) over a month after Doris disappeared, her mother, Bernice Butt, noticed that Lentz had removed a sofa from his living room. *Id.* at 14. The majority believes that this circumstantial evidence provided "a logical and supporting evidentiary basis for the jury to conclude that Doris was 'held' by Lentz after she arrived at his house but before the fatal wounds were inflicted." *Ante* at 15. I respectfully disagree.

As the majority acknowledges, the government did not introduce any direct evidence that Doris was held. *Ante* at 16. Therefore, the majority's theory is correct only if the six pieces of circumstantial evidence listed above allow the reasonable inference that Doris was held. It goes without saying that "inferences from facts which have been [proven] by circumstantial evidence may be sufficient to sustain a verdict of guilt." *United States v. Thomas*, 453 F.2d 141, 143 (9th Cir. 1971); *see also Jackson*, 443 U.S. at 319; *Stamper v. Muncie*, 944 F.2d 170, 174 (4th Cir. 1991). And we must "accord[ ] the benefit of all reasonable inferences to the government." *Evans-Smith*, 19 F.3d at 905. However, "an inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982) (internal quotation marks and citations omitted); *see also Galloway v. United States*, 319 U.S. 372, 395 (1943); *United States v. Galbraith*, 20 F.3d 1054, 1057 (10th Cir. 1994); *Evans-Smith*, 19 F.3d at 908 n.22 ("While all inferences must be made in favor of the prosecution, leaps of logic should not be."); *Thomas*, 453 F.2d at 143.

When the evidence in this case is reviewed in light of these principles, it becomes clear that a jury could not rationally infer beyond a reasonable doubt that Doris was held for an appreciable period. Drawing such an inference would necessarily require an impermissible degree of speculation and conjecture. At the most, the evidence cited by the majority demonstrates that: (1) Lentz devised a scheme to lure Doris to travel to his house on April 23, 1996, and he intended to cause her harm when she arrived; (2) Lentz took steps to insure that nobody would be around when Doris arrived; (3) Doris did arrive at Lentz's house on April 23, 1996; (4) after Doris arrived, some harm befell her that led to her death; and (5) Lentz transported Doris's body

in her car. Although these permissible findings (almost all requiring inferences) strongly suggest that Lentz was involved in Doris's disappearance and was ultimately responsible for her death, none permit the further inference that Doris was *held* for an appreciable period of time before her death.

The majority's analysis simply assumes a jury could infer that Doris was confined and killed in Lentz's house based on the facts that she arrived at his house, that Lentz did not want people around when she arrived, and that Doris subsequently died. While these facts are consistent with the theory that Doris was confined in Lentz's house prior to her death, that is only one possibility. Lentz could have killed Doris in any number of ways that did not involve a holding. For example, Lentz could have taken Doris's life the moment she walked into his house. Or he could have inflicted a deadly wound from a concealed position before she had a chance to enter the house. Indeed, it might have been advantageous for Lentz to kill Doris immediately upon her arrival in order to minimize the risk that she would put up a struggle or scream for help. Of course, if Lentz killed Doris as soon as she arrived, he did not hold her for the appreciable period necessary for a federal kidnapping. *See Chatwin*, 326 U.S. at 460 (concluding that the holding element "necessarily implies an unlawful physical or mental restraint *for an appreciable period*") (emphasis added); *see also United States v. Etsitty*, 130 F.3d 420, 429 (9th Cir. 1997) (Kleinfeld, J., concurring) ("[I]f [the holding] was not for an appreciable period, then treating the seizure and confinement of the victim as kidnapping would exceed the scope of the statute."); *United States v. Howard*, 918 F.2d 1529, 1536 (11th Cir. 1991) (overturning kidnapping conviction when "[t]here [wa]s no evidence in the record that appellants intended to detain [the victim] . . . beyond the few seconds it would take to [rob him]"); *Gov't of Virgin Islands v. Berry*, 604 F.2d 221, 227-28 (3d Cir. 1979) (overturning kidnapping conviction when "the degree of confinement to which [the victim] was subjected was no greater than that which is inherent in the commission of [assault]").

At trial the government tried to downplay the possibility of an immediate killing by saying, "[t]here's no evidence of that. There's no evidence that neighbors heard a gunshot. She clearly was inside that house [when she was killed]. . . . This was a quiet crime that no

one heard." J.A. 1616. But Lentz did not have to prove that Doris's death was immediate; rather it was the government's burden to prove beyond a reasonable doubt that Doris was *not* killed immediately. All of the evidence cited by the majority, including the presence of the tarp, Lentz's plans to keep people away from the house, the blood in Doris's car, and even the missing couch, suggest that Lentz was planning to, and did in fact, dispose of Doris's body on the night of April 23, but this evidence does not show what happened to Doris immediately before she died. The AUSA unwittingly put his finger on the problem when he said in closing, "we don't know exactly what happened to Doris Lentz when she got to the defendant's house on April the 23rd. But we know that she ended up dead." J.A. 1940. A jury might conclude, based on intuition, that because Doris arrived at Lentz's house, she went inside and was held for some amount of time before being killed. But "intuition cannot substitute for admissible evidence when a defendant is on trial," *United States v. Hamblin*, 911 F.2d 551, 558 (11th Cir. 1990), and the government failed to produce any evidence that demonstrated beyond a reasonable doubt that Lentz held Doris before she died.

The majority might have a stronger argument if the evidence showed that Lentz actually brought Doris into his house or that she was murdered inside. Contrary to what the majority says, *see ante* at 14, however, the record does not establish that either of these events occurred. The majority, for example, relies on testimony indicating that Lentz removed a sofa from his living room at some point. The witness who gave this testimony never said when she had last seen the sofa in Lentz's house, so the sofa could have been removed before Doris disappeared. Even if the sofa was removed after the evening of April 23, 1996, a jury could not reasonably infer from the disappearance of a piece of furniture that Doris entered Lentz's house, *was confined there*, and was then murdered. This inference would be particularly speculative in light of the fact that investigators never found any physical evidence linking Doris to the interior of Lentz's house. *See Evans-Smith*, 19 F.3d at 909-10 n.29 ("Favoring the prosecution with all inferences does not mean that we must ignore evidence that is in the record, but which they ignore.").

The majority also argues that the holding element was satisfied because the evidence showed that "[f]rom the moment Doris pulled

up at Lentz's home . . . Lentz was then in a position to confine her physically if necessary." *Ante* at 15. To support this argument, the majority cites *United States v. Higgs*, 353 F.3d 281, 313 (4th Cir. 2003). The defendant in *Higgs* tricked three young women into entering his van by offering them a ride home. The defendant then drove to a secluded spot and shot all three. Our court reasoned that the holding element had been satisfied because once the victims had entered the van, the defendant "confin[ed] [them] . . . under the pretense of taking them home," and he was further "prepared to confine them at gunpoint if necessary." *Id.* at 313. *Higgs* merely stands for the proposition that a holding can occur when the perpetrator is confining his victim through deception, while holding force in reserve. The case does not alter the definition of a holding, which requires an *actual* "physical or mental restraint for an appreciable period," *Chatwin*, 326 U.S. at 460, not simply a willingness to restrain should it become necessary. In this case, as I have pointed out, there is no evidence that Doris was confined, by deception or otherwise, after she arrived at Lentz's house. Nor is there any evidence that Lentz was in Doris's company any longer than was necessary to kill her. Accordingly, *Higgs* does not strengthen the majority's argument.

From the very beginning of this case the government has had trouble articulating how a jury could reasonably infer that Lentz held Doris for an appreciable period after she arrived at his house but before she died. The government's only argument on this score has been that "somehow or other [Lentz] detained [Doris at his home] and he killed her. . . . [Lentz] had to hold her to detain her to ultimately kill her." J.A. 1614-15. However, as our court has said before, "to start with the assumption that the crime was committed and then to show that each piece of circumstantial evidence can be explained in a consistent manner is fundamentally different from examining each piece of evidence and finally concluding beyond a reasonable doubt that the defendant [is] guilty [of each element of the crime]." *Evans-Smith*, 19 F.3d at 910. The majority has demonstrated that the evidence is not inconsistent with the theory that Doris was confined or held before she died. What it has failed to do, however, is explain how each piece of evidence could build to the fair or rational inference that Lentz held Doris after she arrived at his house but before she was killed. This is not a case in which there is conflicting evidence on whether a holding occurred. Rather, this is a case in which

there is no evidence that tells us what happened as far as the holding issue is concerned. *See Twin Oaks Nursing Home*, 692 F.2d at 1328. And the *mere possibility* that Doris was held prior to her death is too speculative to be the basis for a jury verdict of guilt.

I would affirm the district court's determination that "the government simply did not provide evidence supporting a finding that Ms. Lentz was held in connection to her alleged murder." J.A. 2384. Doris Lentz's disappearance and (almost certain) death present a dreadful case that needs to be solved. The Federal Kidnapping Act does not offer a solution, however, because there is no evidence of a holding.